[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a three count action by Animal Health Clinic, P.C., a veterinarian hospital seeking injunctive relief and damages from Andrea Autorino, D.V.M. for allegedly converting confidential lists of customers and misappropriating "trade secrets" within the meaning of General Statutes § 35-51, as well as CUTPA relief under General Statutes § 42a-110.
Trial was held in this court on December 18, 19 and 22, 1997. The following facts are not in dispute or could be reasonably found.
Defendant left her eight year employment as a veterinarian with Hartford Veterinary Hospital in early November, 1995, to join the plaintiff, a veterinarian hospital basically owned and managed by Dr. Patrick Hallisey, D.M.V. ("Hallisey"), at 60 Beaver Road, Wethersfield. At that time, with Hallisey's approval and financial support, plaintiff sent announcements to her former clients at Hartford Veterinary of her new position and location. On March 13, 1996 she notified Hallisey in writing that she would be leaving his employ on March 27, 1997 to begin her own animal hospital in another location in Wethersfield. In a series of meetings and correspondence, Hallisey tried to persuade plaintiff to remain with him, but plaintiff had obtained, with the help of family, a suitable location in Wethersfield where she was determined to conduct her own practice. Because the weekend following the proposed termination date was Easter weekend, Autorino agreed to work through Sunday, March 30. Over that weekend she mailed several hundred letters to clients announcing that she was opening her own practice in Wethersfield in mid-April.
Defendant concedes that the names and addresses of some of the clients to whom she mailed announcements were obtained from the "call-back" lists generated by the office computer and directed to each veterinarian in plaintiff's office for the purpose of making follow-up good will calls CT Page 3666 after a client's visit to the hospital. Although plaintiff claims that each veterinarian was instructed to destroy the call-back lists after the calls were made, defendant does not recall such instruction. It was her practice to let the call-back slips accumulate on her desk after making the calls and with Hallisey's acquiescence she often took them home in order to make the calls. She admittedly used the call-back lists to compile her own lists of clients served by her and these lists were subsequently used in the mailing she sent out on March 29. That mailing consisted of 600-700 names, made up in part from her prior mailing list of 200-300 names used in November 1995, names furnished to her by family and friends, and names taken from the call-back lists estimated at 150. In addition she placed a listing for her new hospital in the telephone yellow pages.
At trial, two clients of the plaintiff testified that they received announcements dated March 27, 1997 from the defendant. Both had had services performed on their animals by the defendant while she was employed by plaintiff. The letter of announcement read as follows:
 I am pleased to inform you that after practicing veterinary medicine in this area for the past eleven years, I will be opening my own veterinary hospital in April of 1997. The animal hospital will be located at:
 Double A Veterinary Hospital 106 Nott Street Wethersfield, CT (860) 529-0668
 While our new facility will not be open until mid-April, our voice mail service is up and running today. I will be happy to answer any and all questions you might have and can accept appointments starting April 14th.
 Please stop by anytime to view our new hospital. This is truly a dream come true for me that I hope to share with you.
Sincerely, CT Page 3667
Andrea C. Autorino, D.V.M.
Plaintiff concedes that defendant did nothing wrong in sending out her announcements to clients to whom she had rendered services while in his employ. He claims that what she did wrong was to send out her announcements while she was still employed by him and to compile her mailing list of names and addresses from the call-back lists which belonged to him.
No agreement or covenant of any kind covering non-competition has been alleged or was entered into by the parties.
— I —
In his complaint plaintiff claimed that defendant began using the call-back lists to solicit plaintiff's clients while she was still employed by plaintiff. The evidence does not show that the defendant was still employed by the plaintiff, except in the most technical sense when she sent out her announcements. On March 13, 1997, she gave two-weeks notice of her leaving. Her last day of work was supposed to be Thursday, March 27, but because of the Easter weekend she was asked by plaintiff to work through Sunday March 30, and she did so. She mailed the announcements on Saturday, March 29 and no one received them prior to Monday, April 1. The announcements referred to possible appointments with her hospital starting April 14. In no substantive sense can it be concluded that defendant breached her professional or fiduciary duty to the plaintiff by sending out these announcements while she was still employed by him. Moreover, plaintiff has not pressed this claim in his post trial brief.
— II —
Plaintiff's primary claim is that the call-back slips were "trade secrets" within the meaning of General Statutes § 35-51 (d), specifically referring to the term "customer list" as being within the definition of trade secrets in that section, which reads in pertinent part as follows:
 (d) Notwithstanding the provisions of sections 1-19, 31-40j to 31-40p, inclusive, and subsection CT Page 3668 (c) of section 12-62, "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from this disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
General Statutes § 35-52 provides injunctive relief for actual or threatened "misappropriation" of a trade secret.
General Statutes § 35-53 provides for the awarding of damages for the "actual loss" caused by "misappropriation."
General Statutes § 35-51 (b) defines "misappropriation" in pertinent part as follows:
 (b) "Misappropriation" means: . . . (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was. . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-19, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62.
The general rule is that, in the absence of an express contractual provision, upon assuming a new and competitive employment, an employee may properly solicit his former employer's customers. L. Altman, Callman on Unfair Trade Competition, Trademarks and Monopolies (4th Ed. 19994 § 14.31, p. 110). It appears to be the rule in Connecticut that "after the termination of an employees agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he was employed." Holiday Food Co. v. Munroe, 37 Conn. Sup. 546,550 (1981). Where a list of customers is, because of some CT Page 3669 peculiarity of the business, a trade secret an employee who has obtained such a list in confidence will be restrained from using that list against his employer's interest; but where the identity of the customers are readily ascertainable through ordinary channels or directions, the list will not be accorded the protection of a trade secret.Town County House Homes Service, Inc. v. Evans,150 Conn. 314, 318 (1963).
Under the statutory definition of trade secret, plaintiff is required to prove that the call-back lists were not generally known to other persons and not readily ascertainable by proper means by other persons and that the call-back lists were the subject of efforts that are reasonable under the circumstances to maintain their secrecy. Plaintiff has not met his burden of proof on either prong of this definition.
The defendant could have kept daily notes of the clients that she served as well as the names of their animals without violating any contract or ethical rule. Although plaintiff and his office manager testified that defendant was told to destroy the call-back lists after she made the required calls, this claimed instruction was never put in writing and the conflicting evidence on this point was not sufficient to sustain plaintiff's burden. The names and addresses could have been obtained at any time from the individual files of each client which were stored in an open, easily accessible office area. The circumstances and lack of security with respect to these files hardly indicates efforts on the plaintiff's part that "were reasonable to maintain its secrecy."
It appears to be the general rule that a customer list of readily ascertainable names and addresses will not be protected as a trade secret. Empire Farms Court v. Bailey,637 N.Y.S.2d 211 (1997). See also USA Chem., Inc. v.Goldstein, 512 F.2d 163, 168 (2nd Cir. 1975). Lowther v.Hochberg, Superior Court for judicial district of New Haven, Docket No. 338205, 7 CSCR 1337 (November 4, 1992, Hodgson J. involved a claim by an optician that his former partner had violated the Uniform Trade Secrets Act. (General Statutes § 35-50, et seq.) by contacting plaintiff's customers listed in a computer disc he retained and sending them solicitations. Judge Hodgson found that a back-up disc of CT Page 3670 the records of the clients treated by the defendant was made with plaintiff's knowledge and acquiescence and therefore plaintiff had not sustained his burden under the statute.
In the present case, there was a lack of proof connecting plaintiff's use of the call-back lists to the loss of any clients of plaintiff's to the defendant. Defendant was an established veterinarian in the community prior to her affiliation with plaintiff. Many of the names to whom the announcements were sent were obtained from her family who were well known and established in the community and may have included some names on the call-back lists.
Neither of the witnesses who testified on the plaintiff's behalf, as long standing clients who received announcements from the defendant, testified that he took his business to the defendant.
Finally, there was no evidence, and plaintiff did not claim, that defendant sent an announcement to anyone she had not professionally served. It is part of common experience that clients served by a professional in one business affiliation will often follow that professional when established in a new affiliation. Plaintiff was candid in testifying to the quality of defendant's professional services, her pleasing qualities to clients and his desire of retaining her service. These qualities of the defendant were natural causes for clients served by her while in the employ of plaintiff for seeking her services after she established her own hospital whether they received announcements or not.
Because the call-back lists do not, under all the circumstances in this case, qualify as a "trade secret" under our statute and plaintiff has failed to prove any loss of business attributable to defendant's use of the call-back lists, judgment is entered for the defendant.
Jerry Wagner Judge Trial Referee